**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BOBBY WAYNE MOSS,**

      **Plaintiff,**

**v.**                          **Case No.: 2:15-cv-13160**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF

No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   Procedural History

On January 25, 2012 and February 6, 2012, Plaintiff Bobby Wayne Moss ("Claimant") completed applications for DIB and SSI, respectively, alleging a disability onset date of January 1, 2011, (Tr. at 281-90), due to "Gall Bladder, Back Pain, Rheumatoid Arthritis, Knee Pain (needs replaces [*sic*]), learning problem, dyslexic, High Blood Pressure, [and] Pancreatitis." (Tr. at 343). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 126-35, 137-42). Claimant filed a request for an administrative hearing, (Tr. at 143-46), which was initially held on March 28, 2013 before the Honorable Harry C. Taylor, II, Administrative Law Judge ("ALJ"). (Tr. at 47-51). At the hearing, Claimant requested a continuation in order to obtain counsel, which the ALJ granted. (Tr. at 50). Claimant subsequently obtained legal representation, and the administrative hearing resumed on November 13, 2013. (Tr. at 52-83). At the hearing, Claimant amended his alleged disability onset date to January 19, 2012. (Tr. at 67-68). By written decision dated April 8, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 35-42). The ALJ's decision became the final decision of the Commissioner on August 11, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing

Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant filed a Memorandum in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a reply, (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 44 years old at the time of the alleged onset of disability and 46 years old at the time of the ALJ's decision. (Tr. at 42, 67-68, 281). He has a high school education and communicates in English. (Tr. at 63, 342, 344). He previously worked as a crew member and manager of several fast food restaurants. (Tr. at 64-67, 344).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability

to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2014. (Tr. at 37, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 19, 2012, the

alleged disability onset date. (Tr. at 37, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative joint disease of the knees, lumbar strain and left shoulder strain." (Tr. at 37-38, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 38, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently[.] The claimant cannot raise his left arm above shoulder level[.] The claimant can perform occasional bending, stooping, climbing, crawling, kneeling and balancing[.] The claimant needs to change positions, (stand and walk 15 to 30 minutes and/or sit and stand for 15 to 30 minutes).

(Tr. at 38-40, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of his past relevant work. (Tr. at 40-41, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 41-42, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1967 and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 41, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the

national economy, including work as a garment bagger or sorter at the light exertional level and document preparer at the sedentary exertional level. (Tr. at 41-42, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and therefore, he was not entitled to benefits. (Tr. at 42, Finding No. 11).

### IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises three challenges to the Commissioner's decision. First, Claimant alleges that the ALJ violated his right to due process and erred by declining to hold a supplemental hearing to address evidence entered into the administrative record after the November 2013 administrative hearing. (ECF No. 12 at 8). Claimant asserts that the ALJ "scheduled and then abruptly declined to hold a supplemental hearing at which [he] would have been given the opportunity to present additional evidence related to his hand and upper extremity impairments." (*Id.*) Claimant points out that Laurie E. Rennie, M.D., a medical expert, stated at the administrative hearing that new evidence regarding Claimant's upper extremity and hand pain would require further analysis of his functional limitations. (*Id.*) According to Claimant, he introduced evidence of bilateral finger and hand pain, weakness, and numbness from Charleston Area Medical Center ("CAMC") (contained in Exhibit 4F) after the administrative hearing, but before the ALJ rendered his decision. (*Id.* at 11). However, the ALJ never held a supplemental hearing to address this evidence, despite the fact that the ALJ had scheduled a supplemental hearing and issued a Notice of Hearing. (*Id.*) Instead, after the Notice of Hearing was sent, the ALJ informed Claimant that the supplemental hearing was unnecessary and that an "on-the-record" decision could be made. (*Id.*) Claimant avers that he was "induced into believing he would have an opportunity to respond orally to post-hearing evidence," and because he was not given this opportunity, his right to due process was violated. (*Id.* at 12).

Second, Claimant argues that the ALJ failed to provide an adequate explanation for his RFC finding. (*Id.*) Claimant contends that the ALJ's RFC discussion "vaguely cited to relatively few pieces of medical evidence from the record and relied primarily on the testimony of a medical expert who testified at [the administrative] hearing." (*Id.* at 13-14). However, in Claimant's view, "the ALJ did not provide any clues to which parts of the medical expert testimony he considered in making his RFC finding nor did he acknowledge that [the] expert testimony was incomplete in light of the new evidence" that Claimant submitted after the administrative hearing. (*Id.* at 14). Claimant insists that the ALJ's RFC discussion cannot be meaningfully reviewed by this Court. (*Id.*)

Lastly, Claimant argues that new evidence submitted to the Appeals Council warrants reversal. (*Id.*) Claimant states that he submitted new and material evidence to the Appeals Council, which was entered into the record as Exhibit 5F. (*Id.* at 15). Claimant contends that this evidence shows multilevel degenerative changes and neural foraminal narrowing of the cervical spine as well as decreased sensation in his left hand, decreased range of motion of the cervical spine, and depression. (*Id.* at 16). According to Claimant, despite accepting this new evidence, the Appeals Council erroneously declined to review and remand the ALJ's decision. (*Id.* at 15-16). Claimant insists that remand is appropriate because the new medical evidence renders the ALJ's decision unsupported by substantial evidence. (*Id.* at 16).

In response to Claimant's first challenge, the Commissioner argues that the ALJ was not required to hold a supplemental hearing. (ECF No. 13 at 11). The Commissioner maintains that the records submitted by Claimant after the administrative hearing, but prior to the ALJ's decision, "do not indicate any deterioration in [Claimant's] condition and are cumulative of the evidence that was already in the record when the ALJ held the

hearing." (*Id.* at 12). Moreover, the Commissioner asserts that this evidence "did not provide a basis for finding any additional limitations that warranted consider by a [vocational expert]." (*Id.*) As for Claimant's due process argument, the Commissioner argues that Claimant was not deprived of any property interest in disability benefits and that Claimant possessed no right to a supplemental hearing. (*Id.* at 13-14).

With respect to Claimant's second challenge, the Commissioner contends that the ALJ's RFC finding is supported by substantial evidence. (*Id.* at 9). The Commissioner posits that Claimant's knee problems were accounted for by the sit-stand option included in the RFC finding. (*Id.*) Regarding Claimant's back pain, the Commissioner notes that the ALJ summarized treatment records showing normal range of motion, gait, strength, and sensation. (*Id.* at 10). As to Claimant's complaints of shoulder pain and left hand weakness, the Commissioner asserts that the ALJ aptly recognized Claimant's physical examinations revealed 5/5 upper extremity strength and no sensory deficits. (*Id.*) Moreover, the Commissioner notes that the ALJ limited Claimant to work that would not require him to raise his left arm above shoulder level. (*Id.* at 9). With respect to any cervical spine impairments, the Commissioner points out that an x-ray and an MRI of Claimant's cervical spine were normal. (*Id.* at 10). In addition, the Commissioner contends that the ALJ's RFC finding is substantiated by the opinions of Subhash Gajendragadkar, M.D., who is a non-examining state agency consultant, and Dr. Rennie. (*Id.* at 10-11).

Lastly, the Commissioner responds to Claimant's third challenge by maintaining that the records submitted to the Appeals Council would not have changed the ALJ's decision. (*Id.* at 13). The Commissioner insists that the Appeals Council was not obligated to explain its rationale for concluding that the additional evidence from CAMC would not

have altered the ALJ's decision. (*Id.* at 14). Furthermore, the Commissioner argues that the CAMC records did not support any greater functional limitations than those contained in the ALJ's RFC finding. (*Id.*) Specifically, the Commissioner notes that a June 2013 x-ray of Claimant's cervical spine showed no evidence of subluxation or soft tissue abnormalities. (*Id.* at 14-15). Additionally, the Commissioner points to an MRI of Claimant's cervical spine in December 2013 that showed only "mild multilevel spondylotic changes without advanced canal stenosis." (*Id.* at 15). As such, the Commissioner avers that the CAMC evidence submitted to the Appeals Council did not demonstrate that Claimant suffered from a more severe spinal condition than was found by the ALJ, or that Claimant experienced limitations due to any spinal condition. (*Id.*)

In reply, Claimant argues that he was not required to demonstrate an entitlement to benefits before his right to due process attached. (ECF No. 14 at 1). He insists that he possessed a property interest in his Social Security claim, and thus, he was entitled to due process in the disposition of his claim. (*Id.* at 2). He contends that the ALJ nevertheless violated due process by scheduling, then canceling a supplemental hearing without providing him with reasonable notice and an opportunity to respond. (*Id.*) Claimant asserts that the ALJ induced him to believe that he would have an opportunity to provide additional testimony concerning his upper extremity impairments after the CAMC records were submitted. (*Id.* at 4-5). Separately, Claimant maintains that the ALJ's decision is not supported by substantial evidence in light of the evidence submitted to the Appeals Council. (*Id.* at 6-7).

## V.   Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized as follows.

9

### A. Treatment Records

On March 7, 2011, Claimant presented to Saint Francis Hospital reporting left shoulder pain. (Tr. at 539). Claimant described the pain as sharp and rated it nine on a ten-point pain scale. (Tr. at 540). Claimant indicated that the pain worsened with raising his left arm. (*Id.*) A review of systems was positive for decreased range of motion, numbness, and tingling. (*Id.*) Upon examination, Claimant had limited range of motion of the left shoulder. (*Id.*) An x-ray of Claimant's left shoulder revealed no acute changes. (*Id.*) Claimant was assessed with acute arthralgia of the left shoulder, history of current dislocation, and tendonitis of the left shoulder. (*Id.*) Claimant was provided a sling for his left arm and given injections of morphine, Toradol, and Zofran. (Tr. at 551). He was discharged in stable condition. (Tr. at 540).

On May 9, 2011, Claimant returned to Saint Francis Hospital reporting sharp pain in his left temple and left arm numbness and tingling. (Tr. at 518). A review of systems was negative for arthralgia and myalgia. (*Id.*) A physical examination was normal. (Tr. at 519). Claimant was assessed with sinusitis and a headache, which had resolved. (*Id.*)

Claimant again visited Saint Francis Hospital on May 15, 2011 with complaints of a headache and fatigue. (Tr. at 496). A review of systems was otherwise negative. (*Id.*) Upon examination, Claimant's gait and musculoskeletal system were observed to be normal. (Tr. at 497). Claimant was assessed with a headache and sinusitis, and he was given a Toradol injection. (Tr. at 497, 509).

Claimant visited Charleston Area Medical Center ("CAMC") on May 18, 2011 complaining of a headache. (Tr. at 565). Claimant also reported a history of sinus problems, back pain, and pancreatitis. (Tr. at 565, 567). He indicated that a recent lumbar puncture at Saint Francis Hospital was within normal limits. (Tr. at 565). A review of

systems was negative for myalgia. (*Id.*) A physical examination was negative other than Claimant's complaint of headache. (Tr. at 566). Claimant was diagnosed with chronic headache, likely caused by chronic cigarette use, overuse of medication, and stress; depression; gastroesophageal reflux disease; and seasonal allergies. (*Id.*) Claimant was counseled about cigarette cessation and given a prescription for Paxil. (*Id.*)

On July 12, 2011, Claimant returned to CAMC for a follow up regarding his headaches. (Tr. at 564). Claimant also reported a history of chronic knee and back pain. (*Id.*) Claimant used ibuprofen for pain relief. (*Id.*) Claimant was assessed with chronic headache, history of depression, gastroesophageal reflux disease, and transaminitis (elevation of transaminases in the liver), which had resolved and was likely due to Claimant's use of Tylenol. (*Id.*)

Claimant visited Saint Francis Hospital on July 17, 2011 reporting low back pain over the prior two days. (Tr. at 475-76). Claimant stated that he had experienced low chronic back for the previous sixteen years and that an increase in pain precipitated his visit. (Tr. at 488). He indicated that the pain radiated down his right leg. (*Id.*) He denied any loss of bowel or bladder control. (*Id.*) A review of systems was normal, except for back pain. (*Id.*) A physical examination was normal, other than vertebral point tenderness and muscle spasm of the back. (Tr. at 491). The treater observed that Claimant's extremities were non-tender with normal range of motion and no edema. (*Id.*) Claimant's neck retained normal range of motion and was non-tender. (*Id.*) He had a normal gait, reflexes, and sensation. (*Id.*) Claimant was given an injection of ketorolac tromethamine and provided prescriptions for Decadron and Flexeril. (Tr. at 492-93). He was also given a note excusing him from work for three days. (Tr. at 494). Claimant was advised to follow up with Dr. Navarro at CAMC. (Tr. at 493).

Claimant returned to Saint Francis Hospital on October 9, 2011 with complaints of left knee pain. (Tr. at 455). He stated that, earlier in the day, he stood up, felt his knee "pop," and fell down onto his left knee. (Tr. at 455, 468). A review of systems was positive for lower extremity pain. (Tr. at 468). Examination of Claimant's knee showed no joint swelling; however, bony and soft tissue tenderness were observed. (Tr. at 470). An x-ray of Claimant's left knee was negative for fracture or dislocation. (Tr. at 473). Claimant was diagnosed with an injury of the left knee. (Tr. at 471). He was administered ketorolac tromethamine and prescribed Naprosyn. (*Id.*) He was instructed to ice, rest, and elevate his knee. (*Id.*)

On October 11, 2011, Claimant visited CAMC stating that he had hurt his left knee two days prior and he was now having swelling and redness of the left foot and calf with worsening pain. (Tr. at 561-62). Claimant's treater observed that Claimant exhibited "blanching redness" in his left lower extremity. (Tr. at 562). Examination of the left lower extremity revealed present pulse with tenderness over the medial aspect of the left knee. (*Id.*) Claimant's knee was negative for Homan's sign and Drawer's sign. (*Id.*) No ligament instability was observed. (*Id.*) Claimant was diagnosed with knee pain and leg swelling. (*Id.*) He was prescribed Lortab and advised to return in two weeks. (*Id.*)

Claimant followed up at CAMC on November 15, 2011. (Tr. at 559-60). Claimant indicated that his left knee continued to hurt, describing the pain as six out of ten. (Tr. at 560). Additionally, he stated that his left knee remained swollen and he was unable to bear weight on it. (*Id.*) However, he asserted that Lortab relieved his pain and that he did not have difficulty performing activities of daily living. (Tr. at 559). Upon examination, Claimant's musculoskeletal strength was recorded as 5/5, and no instability of the left knee was observed. (*Id.*) Claimant was assessed with left knee pain and provided with a

prescription for Lortab. (*Id.*)

Claimant presented to Saint Francis Hospital on January 11, 2012, with complaints of abdominal pain, upset stomach, and headache. (Tr. at 420). A review of systems was negative, other than stomach issues and headache. (Tr. at 435-36). Upon examination, Claimant's back and extremities were non-tender. (Tr. at 439). His extremities retained normal range of motion and were non-swollen. (*Id.*) Claimant was assessed with gastroenteritis, and he was prescribed Zofran and Ultram. (Tr. at 441, 451).

On January 24, 2012, Claimant visited CAMC for low back and left wrist pain. (Tr. at 558). He also stated that his left knee continued to hurt. (*Id.*) Claimant indicated that his back pain was nine out of ten and that alternating between sitting and standing every fifteen minutes relived his back pain. (Tr. at 557). A musculoskeletal examination revealed that Claimant's strength was 5/5. (Tr. at 558). The treater observed no left knee instability. (*Id.*) Claimant was assessed with left knee pain and left wrist pain, and he was prescribed Mobic. (*Id.*)

Claimant presented to West Virginia Health Right on April 18, 2012 with complaints of left knee pain stemming from an old injury from the 1980's. (Tr. at 572). Claimant reported that he was currently unemployed and that the most activity he performed in a day was cleaning his home. (*Id.*) Claimant informed his treater, Dr. Legg, that his knee was "giving out" and "cracking" when he walked. (*Id.*) He also told Dr. Legg that he had a history of rheumatoid arthritis with chronic multiple joint pain. (*Id.*) Upon examination, Claimant's left knee was tender and a McMurray's test was positive. (*Id.*) Claimant was assessed with left knee pain, which Dr. Legg opined might be caused by a meniscal tear. (*Id.*) Dr. Legg ordered an MRI and referred Claimant to a rheumatologist. (*Id.*)

Two days later, Claimant underwent an MRI of his left knee at CAMC. (Tr. at 571). Jeffrey C. Dameron, M.D., recorded that the MRI revealed a small focal area of edematous change within the patella, which he believed might relate to early patellofemoral joint degenerative disease associated with chondromalacia patella. (*Id.*) Dr. Dameron did not observe any significant effusion or internal derangement. (*Id.*) He noted mild degenerative joint disease of the meniscus. (*Id.*)

On April 24, 2012, Claimant returned to CAMC with complaints of back, knee, and bilateral hand pain. (Tr. at 569-70). Claimant indicated that his hands and wrists felt stiff, and his fingers on both hands had been swollen and painful. (*Id.*) He stated that Lortab relived his pain, but his ailments interfered with his activities of daily living. (Tr. at 569). On examination, Claimant's musculoskeletal strength remained 5/5. (Tr. at 570). The treater assessed Claimant with knee chondromalacia and arthritis. (*Id.*) The treater was uncertain whether Claimant's arthritis was osteoarthritis or rheumatoid arthritis. (*Id.*) Claimant was advised to continue his medication regimen of Lortab and Mobic. (*Id.*)

Claimant presented to CAMC on July 24, 2012 with a complaint of left ear pain. (Tr. at 580). He also indicated he had chronic pain in the hands, knees, and back, which was relieved by Lortab. (*Id.*) Claimant denied that he had any problem with mobility or performing activities of daily living at that time. (*Id.*) However, Claimant reported he could only sit for fifteen minutes at a time due to back and knee pain. (Tr. at 581). He stated that his back pain was caused by "carrying big weigh[t]." (*Id.*) Claimant was assessed with ear pain, joint pain, and back pain. (*Id.*) He was continued on Lortab. (*Id.*)

Claimant returned to CAMC on September 18, 2012 to follow up regarding his ear pain. (Tr. at 578-79). In addition to continuing ear pain, Claimant also complained of joint pain, primarily in his knees, wrists, fingers, and elbows along with morning stiffness in

his fingers and knees. (Tr. at 579). Claimant reported that Mobic offered some relief, but it was not as effective as in the past. (*Id.*) A musculoskeletal examination revealed 4/5 strength overall. (*Id.*) There were no signs of inflammation. (*Id.*) Claimant was assessed with left ear pain; arthralgia, worst in the fingers, wrists, knees, elbows, and ankles; and chronic back pain. (*Id.*) Claimant was provided a referral for evaluation of possible rheumatoid arthritis, and his Mobic dosage was increased. (*Id.*)

On March 19, 2013, Claimant visited CAMC for a routine follow up. (Tr. at 576). Claimant complained of joint pain in his knees, left more so than right, and pain in his wrists and fingers. (Tr. at 577). Claimant told the treater that his mood had been "ok," but he had no energy and had lost interest all of his prior activities. (*Id.*) Claimant's erythrocyte sedimentation rate was five. (*Id.*) Claimant was assessed with arthralgia, likely osteoarthritis, and atypical depression. (*Id.*) Claimant indicated that he might undergo surgery for his arthritis with Dr. Legg in the future. (*Id.*) Claimant was continued on Lortab and Mobic, and he was prescribed Cymbalta. (*Id.*)

On June 18, 2013, Claimant returned to CAMC with complaints of back and neck pain. (Tr. at 575). Claimant stated that the pain started approximately one month prior to his appointment, and he described the pain as sharp and radiating to both shoulders. (*Id.*) He also indicated that he was experiencing left hand numbness and weakness. (*Id.*) Upon examination, Claimant's right upper extremity strength was 5/5 and his left upper extremity strength was 4/5. (*Id.*) His treater recorded no sensory deficits. (*Id.*) Range of motion of the neck was limited on the anterior posterior axis and with side-to-side motion. (*Id.*) Claimant was assessed with acute neck pain, and his Lortab dosage was increased. (*Id.*) An x-ray of Claimant's cervical spine was ordered, which was performed that day. (Tr. at 575, 582). Ronald E. Cordell, M.D., recorded that the x-ray revealed

15

normal soft tissues and no acute fracture or subluxation; however, Dr. Cordell observed posterior osteophyte formation at C3-4. (Tr. at 582).

On September 16, 2013, Claimant visited CAMC Outpatient Care Center for a routine follow up and prescription refills. (Tr. at 583). Claimant described pain in his back, neck, and both knees, which he rated as eight out of ten. (*Id.*) Claimant's back pain was persistent, but stable. (Tr. at 585). He indicated that his neck pain was worsening and that it was located at the right posterior neck and bilateral shoulder. (*Id.*) Claimant's mood was depressed, and he reported that his wife had recently passed away. (*Id.*) Upon examination, Claimant's gait was antalgic and he exhibited crepitus. (Tr. at 587). Claimant's right hand sensation was intact while his left hand sensation was decreased. (Tr. at 586-87). On active range of motion testing of the cervical spine, Claimant's extension was fifteen degrees, flexion was thirty degrees, lateral flexion right was fifteen degrees, lateral flexion left was thirty degrees, and rotations right and left were fifteen degrees. (Tr. at 587). Claimant's cervical spine was tender. (*Id.*) He was assessed with neck pain and back pain, and he was prescribed Lortab, Mobic, and Neurontin. (*Id.*) In addition, an MRI of Claimant's cervical spine was ordered. (Tr. at 589).

At Claimant's November 18, 2013 appointment with CAMC Outpatient Care Center, he complained of chronic back, neck, bilateral knee, and bilateral hand pain. (Tr. at 596). He also admitted that he had been taking more Lortab than prescribed. (*Id.*) Claimant described his back pain as persistent and worsening. (*Id.*) He indicated that the pain was located in his low back and radiated to his calves and thighs. (*Id.*) His low back pain was exacerbated by climbing up and down stairs, bending, changing positions, lifting, jumping, running, sitting, standing, and walking. (*Id.*) Claimant stated that his pain in the bilateral posterior neck was severe and worsening. (*Id.*) Neck pain caused

Claimant to experience decreased mobility, problems sleeping, and joint pain, tingling, and weakness. (*Id.*) He stated that his knee pain was constant and aggravated by movement. (*Id.*) Pain medications did not relieve Claimant's knee pain. (*Id.*) Claimant reported that he could not walk more than fifty yards or use stairs. (*Id.*) He told his treater that he normally wore knee braces. (*Id.*) As for his hands, Claimant described the pain as severe and constant. (*Id.*) He indicated that the pain began four or five years prior and worsened with movement. (*Id.*) He also experienced bilateral hand numbness and weakness. (*Id.*) Upon examination, Claimant's right hand exhibited normal sensation while sensation of the left hand was decreased. (Tr. at 598). Right lateral flexion of the cervical spine had improved. (*Id.*) Claimant was assessed with pain of the bilateral knees, bilateral hands, back, and neck. (Tr. at 598-99). He was provided a referral for physical therapy, and an MRI of the cervical spine was again ordered. (Tr. at 598). Amitriptyline was added to Claimant's medication regimen. (Tr. at 599).

Claimant returned to CAMC Outpatient Care Center on December 2, 2013 for a follow up related to his chronic pain. (Tr. at 605). He reported little relief from pain. (*Id.*) Claimant indicated that his neck pain radiated down into both shoulders. (*Id.*) He stated that the pain was made worse with exertion and flexion. (*Id.*) Claimant's back pain was located in his low back and radiated to the thighs. (*Id.*) It was similarly made worse with extension and flexion. (*Id.*) Upon examination, Claimant's cervical spine was tender, and he reported moderate pain with range of motion. (Tr. at 606). Claimant was continued on Mobic, Lortab, and Neurontin. (Tr. at 608). An MRI of the cervical spine and an x-ray of the thoracic spine were ordered. (*Id.*)

Claimant underwent an x-ray of his thoracic spine on December 3, 2013 at CAMC. (Tr. at 624). Russell King, M.D., found the x-ray revealed normal alignment and normal

height of vertebra. (*Id.*) Dr. King observed no fracture, subluxation, or focal bone lesion. (*Id.*) The x-ray revealed clips in the right upper quadrant consistent with cholecystectomy. (*Id.*) Overall, Dr. King opined that the x-ray was unremarkable. (*Id.*)

Claimant visited CAMC for an MRI of his cervical spine on December 27, 2013. (Tr. at 620-21). Michael E. Anton, M.D., interpreted the MRI to show mild multilevel spondylotic changes without advanced canal stenosis. (Tr. at 621). He noted asymmetric right neural foraminal narrowing at C3-C4. (*Id.*)

### B. Opinion Evidence

Agency consultant, Subhash Gajendragadkar, M.D., completed a Physical Residual Functional Capacity Assessment on March 28, 2012. (Tr. at 89-90). As to exertional limitations, Dr. Gajendragadkar opined that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. at 89). Dr. Gajendragadkar also indicated that Claimant retained unlimited ability to push or pull. (*Id.*) With respect to postural limitations, Dr. Gajendragadkar determined that Claimant could frequently balance and occasionally climb stairs, ramps, ladders, ropes, or scaffolds; stoop; kneel; crouch; and crawl. (Tr. at 89). Dr. Gajendragadkar further concluded that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 90). Regarding environmental limitations, Dr. Gajendragadkar opined that Claimant could have unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation; however, Claimant should avoid concentrated exposure to extreme cold, vibration, and hazards, such as machinery or heights. (*Id.*)

Another agency consultant, Uma Reddy, M.D., completed a Physical Residual Functional Capacity Assessment on May 12, 2012. (Tr. at 109-10). Her conclusions as to

Claimant's exertional, postural, manipulative, visual, communicative, and environmental limitations were the same as those of Dr. Gajendragadkar. (*Id.*) In the "Additional Explanation" section of the form, Dr. Reddy noted Claimant was forty-four years old and "well built." (Tr. at 110). She noted that Claimant alleged "back strain, questionable rheumatoid arthritis and knee injury." (*Id.*) Dr. Reddy concluded that Claimant was only partially credible based on the record medical evidence. (*Id.*) Dr. Reddy asserted that Claimant received medical treatment on an as needed basis, and although "significant physical limitations" were noted in the medical evidence, there did not appear to be any Listing level limitations. (*Id.*)

Laurie E. Rennie, M.D., testified at the November 2013 administrative hearing regarding the severity of Claimant's physical impairments and any functional limitations caused by those impairments. (Tr. at 56) Dr. Rennie indicated that his areas of specialty were internal medicine and neurology. (*Id.*) He noted that Claimant complained of left knee pain, which had persisted for many years, and low back pain, which Dr. Rennie described as intermittent and related to turning or lifting. (*Id.*) Dr. Rennie acknowledged that Claimant's left leg exhibited swelling and tenderness at an examination and that a subsequent MRI revealed minor edema with early indications of degenerative joint disease in the knee itself. (Tr. at 57). However, the MRI showed no specific meniscus tear or major internal derangement of the knee. (*Id.*) With respect to Claimant's low back, Dr. Rennie noted that Claimant had not undergone any radiological examinations of the lower back and that clinical examinations did not suggest radiculopathy. (*Id.*) Dr. Rennie also remarked that Claimant reported left shoulder pain and wrist pain to his treaters. (Tr. at 56-57). In addition, Claimant reported stiffness in his wrists and hands beginning in April 2012. (Tr. at 57) As to the left shoulder, Dr. Rennie testified that the only

documented findings were of localized tenderness and possible tendonitis. (*Id.*) Dr. Rennie indicated that there were no injections to or radiological evaluations of the shoulders. (*Id.*) In summarizing Claimant's medical problems, Dr. Rennie stated: "[W]e are dealing with a patient who has multiple joint complaints without significant medical evidence at this time, including early degenerative changes in the ... right knee, chronic complaints in the left knee, lumbar pain ..., recurring headaches ..., and depression." (*Id.*)

Dr. Rennie concluded that Claimant was "impaired," but determined that he did not meet or equal any listed impairment. (*Id.*) As such, Dr. Rennie offered an opinion regarding Claimant's physical RFC. (Tr. at 58). He opined that Claimant could lift twenty pounds occasionally and ten pounds frequently using his right shoulder, and he could only lift ten pounds using his left shoulder, but he could do so frequently. (*Id.*) Dr. Rennie determined that Claimant could perform reaching, but not overhead reaching, especially with his left shoulder. (*Id.*) Dr. Rennie also testified that Claimant could perform continuous "sorting, handling, feeling, and touching" using his hands. (*Id.*) Claimant would require postural limitations due to his back and knee conditions. (*Id.*) Specifically, Claimant would be limited in his abilities to crouch, crawl, kneel, or climb a ladder. (*Id.*) He had no limitation with maintaining balance. (*Id.*) Dr. Rennie further indicated that Claimant's "work environment would not be particularly limited." (*Id.*)

Prior to the conclusion of the hearing, Claimant testified that he experienced joint pain and swelling in his hands, which prevented him from grasping items, such as a pen or a fork. (Tr. at 74). Dr. Rennie stated that, if the limitations described by Claimant regarding his hands were "documented," then these limitations would "significantly" change his "employability." (Tr. at 82). The ALJ then asked Dr. Rennie: "[I]f this condition in the upper extremities – let's say if it were greater than mild ... is that an

indicator that [substantial gainful activity] might be prohibited?" (Tr. at 83). Dr. Rennie replied, "Yes." (*Id.*)

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

### A.  **Whether the ALJ Erred in Failing to Hold a Supplemental Hearing**

In his first challenge, Claimant contends that the ALJ violated his right to due process and erred by failing to hold a supplemental hearing after Claimant submitted the

evidence contained in Exhibit 4F. As Claimant points out, Social Security hearings are subject to due process considerations. *Mays v. Colvin*, 739 F.3d 569, 573 (10th Cir. 2014) (citing *Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005)); *Nichols v. Colvin*, No. 1:14CV536, 2015 WL 4656484, at *2 (M.D.N.C. Aug. 5, 2015); *Wyatt v. Colvin*, No. 5:14-cv-19734, 2015 WL 5012140, at *9 (S.D.W.Va. July 31, 2015); *McAuley v. Colvin*, No. 7:12-cv-311, 2013 WL 7098724, at *7 (E.D.N.C. Dec. 13, 2013). Due process requires that a Social Security hearing be "full and fair." *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *see also Yancey v. Apfel*, 145 F.3d 106, 112 (2d Cir. 1998); *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995); *Farley v. Astrue*, No. 5:12CV29, 2013 WL 162444, at *2 (N.D.W. Va. Jan. 15, 2013). In order to succeed on a due process claim in the Social Security context, a claimant must demonstrate that he was prejudiced by the violation of his rights. *Mays*, 739 F.3d at 573; *Wyatt*, 2015 WL 5012140, at *9; *Pearson v. Colvin*, No. 2:14-CV-26, 2015 WL 3757122, at *31 (N.D.W.Va. June 16, 2015); *cf. Ilunga v. Holder*, 777 F.3d 199, 208 (4th Cir. 2015) (recognizing that in order to prevail on due process claim in administrative immigration proceeding, plaintiff must demonstrate prejudice).

At the November 2013 administrative hearing, Claimant's representative informed the ALJ that she was waiting to receive treatment records from CAMC and that she would supply those records to the ALJ within ten to fourteen days. (Tr. at 55). Claimant's representative requested that the record be held open so that she could submit the records. (*Id.*) The ALJ indicated that he would leave the record open to receive the CAMC treatment notes and that he would "take no action on [Claimant's] case whatsoever right now." (Tr. at 81-82). The ALJ remarked that he would review the CAMC records and "the whole case" to determine whether a supplemental hearing was necessary. (Tr. at 82). If

the ALJ found a supplemental hearing was needed, he explained that he would send a Notice of Hearing to Claimant. (*Id.*) Thereafter, Claimant submitted the CAMC records, which were marked as Exhibit 4F and included the treatment notes summarized above from July 2012, September 2012, March 2013, and June 2013. (Tr. at 574-82).

According to Claimant, on March 5, 2014, Claimant's representative was informed by an employee from the ALJ's office that the ALJ was prepared to make an "on-the-record" decision. (ECF No. 12 at 11). However, on March 13, 2014, the ALJ sent Claimant and his representative a Notice of Hearing scheduling a supplemental hearing for April 8, 2014. (Tr. at 243). Thereafter, Claimant's counsel was again contacted by an employee from the ALJ's office and told that the ALJ would issue an "on-the-record" decision and that a supplemental hearing was unnecessary. (ECF No. 12 at 11). Accordingly, the supplemental hearing was removed from the ALJ's calendar, and the ALJ issued his decision denying benefits on April 8, 2014. (*Id.*)

At least one federal court of appeals has held that a hearing is not "full and fair" when the claimant is denied "a meaningful opportunity to address post-hearing evidence." *Yount*, 416 F.3d at 1236. In *Yount*, the ALJ referred the claimant for a consultative examination after the administrative hearing. *Id.* After receiving the report, the ALJ issued a decision denying benefits without allowing the claimant to cross-examine the consultative examiner or "rebut the report." *Id.* The Tenth Circuit held that the ALJ's reliance on the post-hearing report violated Claimant's right to due process by denying him a "full and fair hearing." *Id.* This Court has similarly held that "where a post-hearing report is significant to the disability determination and will be considered in denying benefits, the ALJ's refusal of a claimant's request to cross-examine the [consultative] examiner is an abuse of discretion under the regulations and constitutes a

denial of due process." *Goan v. Shalala*, 853 F. Supp. 218, 219 (S.D.W.Va. 1994) (marking omitted). However, neither of these cases address the protections afforded by due process after *the claimant* submits post-hearing evidence in the form of *treatment records*.

In support of his argument, Claimant primarily relies on *Stender ex rel. H.S. v. Astrue*, No. 08-cv-1584, 2009 WL 2169245 (D. Colo. July 16, 2009). In that case, an administrative hearing was held at which the claimant and a medical expert testified. *Id.* at *5. During the hearing, the ALJ discovered that "nearly one year's worth of medical records" were missing from the claimant's file. *Id.* As such, the ALJ informed the claimant that the hearing would be continued to obtain the additional evidence, and the ALJ rescheduled the hearing. *Id.* However, after the claimant submitted the additional records, the ALJ never held another hearing; instead, apparently without any further contact with the claimant, the ALJ issued a decision denying benefits. *Id.* at *5, *7. The ALJ's decision was based, in part, on evidence submitted after the hearing. *Id.* at *7, *11. The district court held that the ALJ's reliance on this evidence to deny benefits violated the claimant's right to due process because the ALJ's failure to hold a second hearing deprived the claimant of an opportunity to "meaningfully rebut" the evidence submitted after the first hearing. *Id.* at *11. The district court found that the most critical piece of evidence that the claimant was not afforded an opportunity to rebut was a report from a psychologist who performed a consultative examination of the claimant after the administrative hearing. *Id.* at *3, *11. The court noted that the claimant was not offered an opportunity to rebut the psychologist's report at a supplemental hearing and that the claimant was unaware of a need to respond to the report in writing based on the ALJ's "promise" that a second hearing would occur. *Id.* at *12. As such, the court concluded that the claimant "did not have the full and fair opportunity to question, explain, or refute [the

report's] crucial results because th[e] second hearing never happened." *Id.*

Claimant argues that, like the plaintiff in *Stender*, he "was induced into believing he would have an opportunity to respond orally to post-hearing evidence," but the ALJ abruptly canceled the hearing and denied his applications for benefits, depriving Claimant of his right to due process. (ECF No. 12 at 12). Contrary to Claimant's position, however, the undersigned finds *Stender* is distinguishable from this case for two reasons. First, in this case, the ALJ did not unequivocally promise to hold a supplemental hearing during the administrative hearing. Rather, the ALJ informed Claimant at the administrative hearing that he would review the CAMC records and determine whether a supplemental hearing was necessary. An employee from the ALJ's office later contacted Claimant's representative and explained that a supplemental hearing was unnecessary. While Claimant and his representative subsequently received a Notice of Hearing, Claimant's representative was soon thereafter contacted and informed that the hearing would be canceled. Claimant argues that he anticipated a fully favorable decision was forthcoming as a result of the hearing cancellation; however, he supplies no reason for this belief. (ECF No. 12 at 11). He also does not claim that he protested the ALJ's decision to cancel the hearing, or that he requested an opportunity to explain the significance of the records that he supplied after the hearing. Because there was no unequivocal promise made to Claimant that a supplemental hearing would be held in his case before a decision was rendered, this case is distinguishable from *Stender*. Moreover, to the extent that Claimant's representative received the Notice of Hearing in March 2014, the ALJ's employee twice notified Claimant's representative that a supplemental hearing would not take place.

Second, this case is different from *Stender* in that the evidence submitted to the ALJ after the administrative hearing did not contain a consultative report that was contradictory to Claimant's allegation of disability. In *Stender*, the consultative psychological report submitted to the ALJ was used by the ALJ to deny benefits before the claimant had an opportunity to "meaningfully rebut" the report. 2009 WL 2169245, at *11. Here, the post-hearing evidence consists of treatment records and an x-ray of the cervical spine. In the due process analysis, there is a significant distinction between treatment records generated by a claimant's physician and a consultative examination report obtained for use by the SSA that is contrary to a claimant's disability claim. In particular, due process generally requires that a claimant be permitted to challenge or attack a consultative examination report containing findings or opinions that contradict his allegations of disability. That is not always the case with a claimant's treatment records. Indeed, it is unclear what there was for Claimant to "rebut" in the treatment records submitted after the administrative hearing, and he has not offered any explanation on this front. Indeed, Claimant insists that these treatment records support his claim of disability. (ECF No. 12 at 11-12). As such, Claimant likely would not have challenged the findings contained in the treatment records at a supplemental hearing. Consequently, for these two reasons, *Stender* is not persuasive under the circumstances of this case.

Ultimately, Claimant has not cited any authority for the proposition that an ALJ categorically violates a claimant's right to due process when the claimant submits treatment records after the administrative hearing and a supplemental hearing is not held. Although the constitutionality of a procedure does not depend on its widespread acceptance, the undersigned notes that the process of leaving the administrative record

26

open to obtain additional treatment records and then rendering a decision without a supplemental hearing is quite common. Put simply, due process requires that a claimant be able to meaningfully confront evidence contrary to his disability claim, and in cases of evidence submitted post-hearing, the process due may be a supplemental hearing. However, Claimant has not demonstrated that a due process violation occurred here because he was provided a hearing where he testified regarding his upper extremity impairments and he maintains that the post-hearing evidence submitted to the ALJ supported his disability claim. Furthermore, because Claimant submitted the treatment records to the ALJ, he had an opportunity at that time to explain to the ALJ the significance of any particular record or the records as a whole.[1]

Lastly, Claimant has not demonstrated any prejudice resulting from the ALJ's alleged violation of due process. Claimant has not indicated what additional testimony or information he would have supplied if a supplemental hearing were held. *Cf. Lovett v. Astrue*, No. 4:11CV1271, 2012 WL 3064272, at *11 (E.D. Mo. July 7, 2012) (holding remand not warranted where claimant could not demonstrate prejudice from ALJ's failure to hold supplemental hearing). Claimant has similarly failed to explain how conducting a supplemental hearing after the CAMC records were submitted might have altered the ALJ's decision. *Cf. Zook v. Comm'r of Soc. Sec.*, No. 2:09cv109, 2010 WL 1039456, at *4 (E.D. Va. Feb. 25, 2010) (recognizing that claimant must demonstrate

---

[1] To the extent that Claimant argues in his reply memorandum that due process required the ALJ to obtain an updated medical opinion after receiving the CAMC records, (ECF No. 14 at 4-5), he has cited no authority for this proposition. Social Security Ruling 96-6p states that an ALJ "must obtain an updated medical opinion from a medical expert" only in two circumstances: (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge ... the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable," or (2) "[w]hen additional medical evidence is received that in the opinion of the administrative law judge ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, at *3-*4. Claimant has not contended that the Ruling required an updated medical opinion in this case.

prejudice resulting from due process violation and that prejudice may be found where additional evidence would have been produced that might have led to different decision by ALJ). Indeed, the ALJ considered Claimant's allegations of upper extremity impairment and the purportedly favorable post-hearing records in his written decision. For these reasons, the undersigned concludes that Claimant's due process challenge must fail.

### B. Whether the ALJ Adequately Explained the RFC Finding

Next, Claimant contends that the ALJ failed to provide an adequate explanation for his RFC finding. (ECF No. 12 at 12). Claimant particularly takes issue with the ALJ's purported failure to discuss limitations resulting from Claimant's bilateral upper extremity impairments. (*Id.* at 14). Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level."

*Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ concluded that Claimant retained the ability to perform light work, (Tr. at 38), which requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* §§ 404.1567(b), 416.967(b). The ALJ added to the RFC finding that Claimant could lift and carry twenty pounds occasionally and ten pounds frequently; could not raise his left arm above shoulder level; could occasionally bend, stoop, climb, crawl, kneel, and balance; and needed to change positions every fifteen to thirty minutes. (Tr. at 38).

In assessing Claimant's RFC, the ALJ noted that Claimant alleged disability resulting from physical impairments that caused him chronic pain. (Tr. at 39). The ALJ acknowledged that Claimant alleged pain in his back, hands, and knees, which he claimed limited his ability to stand, bend, grip things, and use his hands. (*Id.*) The ALJ also recognized Claimant's reports of weakness in his knees and swelling in his hands. (*Id.*) Despite these allegations, the ALJ stressed that Claimant indicated he was able to perform some housework, care for his pets, cook, drive a car, shop using a motor cart, and spend time with his family or friends. (*Id.*) Turning to the medical evidence, the ALJ determined that Claimant sought "limited treatment" from his primary care provider for his knee pain and that physical examinations revealed full knee strength with no instability or tenderness. (Tr. at 40). The ALJ also noted that an MRI of Claimant's left knee showed possible early degenerative joint disease and mild degenerative joint disease of the meniscus, but no effusion. (*Id.*) In addition, the ALJ recognized that Claimant stated his knee pain was relieved by alternating sitting and standing, and as such, a sit-stand option was included in the RFC finding. (*Id.*) With respect to Claimant's alleged back pain, the ALJ concluded that the condition was stable and that treatment records evidenced "normal range of motion, gait, strength and sensation." (*Id.*) As for Claimant's alleged shoulder pain and left hand numbness and weakness, citing to Exhibit 4F, the ALJ remarked that Claimant's physical examinations revealed 5/5 strength with no sensory deficits. (*Id.*) The ALJ also indicated that an x-ray of Claimant's cervical spine was normal. (*Id.*) The ALJ then addressed the opinion evidence. He afforded "great weight" to Dr. Gajendragadkar's opinion that Claimant could perform light work with some postural and environmental limitations because it was "consistent with the medical record, which contains essentially unremarkable physical examinations." (*Id.*) The ALJ also assigned

"great weight" to the opinion of Dr. Rennie, which he summarized at step two of the sequential evaluation. (Tr. at 38, 40). According to the ALJ's summary, Dr. Rennie opined that Claimant was able to lift and carry twenty pounds occasionally and ten pounds frequently; he was limited in his ability to crouch, crawl, kneel, and climb ladders, but he could "work at heights" and balance; he could not lift overhead with his left arm; and he could handle, touch, and feel. (Tr. at 38).

After reviewing the ALJ's RFC discussion, the undersigned **FINDS** that the ALJ's discussion of Claimant's alleged upper extremity impairments is insufficient. Although the ALJ recognized that Claimant alleged bilateral hand pain and decreased grip strength in both hands, the ALJ failed to adequately discuss the medical evidence related to these conditions, which frustrates meaningful review by the Court. (Tr. at 39-40). In rejecting Claimant's allegations of limiting bilateral hand pain and decreased grip strength, the ALJ relied on Claimant's activities of daily living, the records from his treatment at CAMC contained in Exhibit 4F, and Dr. Rennie's opinion. Beginning with Claimant's activities of daily living, the ALJ noted that Claimant testified he could cook, drive, shop with a motor cart, perform light housework, and care for his pets. (Tr. at 39). However, the ALJ failed to mention that Claimant stated he did not drive often (twice each month), and when he did drive, he required textured gloves to grip the steering wheel. (Tr. at 74-75). The ALJ also neglected to acknowledge that the extent of Claimant caring for his pets was letting them outside to use the bathroom and that Claimant reported he could not perform chores that required him to grip or push an object, like a lawnmower. (Tr. at 363-65). In addition, Claimant asserted that his cooking habits had changed due to his chronic pain, including hand pain, and that he could only make sandwiches, cereal, or microwavable meals. (Tr. at 363-64). The ALJ failed to explain how Claimant's ability to prepare these

31

simple meals or grocery shop twice each month for fifteen minutes at a time contradicted his claims of bilateral hand pain and decreased grip strength. (Tr. at 365).

As for the medical evidence that the ALJ relied on to discount Claimant's allegations of bilateral hand pain and reduced grip strength, the ALJ's summary of the evidence contained in Exhibit 4F was inaccurate. In discussing Claimant's allegations of "low energy, knee pain, back pain, shooting into the shoulders and numbness and weakness in his left hand," the ALJ remarked that "physical examinations revealed 5/5 strength, no sensory deficits and limited range of motion and an x-ray of the cervical spine was normal." (Tr. at 40). However, none of the treatment records in Exhibit 4F indicate that Claimant's upper extremity strength was 5/5 in both upper extremities. A treatment note from September 2012 states that Claimant's musculoskeletal strength was 4/5 "all over," and a June 2013 record demonstrates that Claimant's right upper extremity strength was 5/5, but his left upper extremity strength was decreased. (Tr. at 575, 579). While treatment records before or contemporaneous with Claimant's alleged onset date may have revealed 5/5 musculoskeletal strength, the ALJ did not cite these records in support of his decision to discount Claimant's allegations of functional limitations related to his hand pain and reduced grip strength. (Tr. at 558, 560). Furthermore, the treatment records contained in Exhibit 4F corroborate that Claimant consistently complained of weakness, numbness, or pain in his hands. (Tr. at 575-81). Additionally, the ALJ described Claimant's cervical spine x-ray as normal, but failed to note the presence of osteophyte formation, or bone spurs, at C3-C4. (Tr. at 582).

Moreover, medical records that were submitted to the Appeals Council and made a part of the administrative record support the need for remand on this issue. In particular, an MRI of the cervical spine in December 2013 showed asymmetric right

neural foraminal narrowing at C3-C4. (Tr. at 621). In addition, treatment records from September and November 2013 demonstrate that sensation in Claimant's left hand was decreased.[2] (Tr. at 587, 598).

Turning to the ALJ's reliance on Dr. Rennie's opinion, he testified that Claimant would be able to perform continuous handling, sorting, feeling, and touching without limitation. (Tr. at 58). However, after hearing Claimant's testimony, Dr. Rennie added that Claimant's alleged hand pain and decreased grip strength would "significantly" alter his employability. (Tr. at 82). Dr. Rennie agreed with the ALJ that, if Claimant's upper extremity conditions were more than "mild," then Claimant may be prohibited from engaging in substantial gainful activity. (Tr. at 83). Ultimately, Dr. Rennie offered his opinion as to Claimant's functional limitations before listening to Claimant's testimony and before Exhibits 4F and 5F were introduced into the record. As such, Dr. Rennie's opinion does not suffice to uphold the ALJ's RFC finding.[3] To the contrary, Dr. Rennie's testimony bolsters the need for remand so that the ALJ may reconsider Claimant's upper extremity impairments.

Given the ALJ's failure to adequately explain his reasons for neglecting to include any manipulative limitations in the RFC finding and the incorporation of evidence into the record by the Appeal's Council that may substantiate Claimant's allegations, the undersigned concludes that the Commissioner's decision must be reversed and that this

---

[2] Because the records in Exhibit 5F were submitted to the Appeals Council and expressly made a part of the administrative record, the undersigned concludes that the Appeals Council implicitly found those medical records to be new, material, and relevant to the time period in question. Therefore, the Court's task is to "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." *Flesher v. Colvin*, No. 2:14-CV-30661, 2016 WL 1271511, at *8-12 (S.D.W.Va. Mar. 31, 2016) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)).

[3] For the same reasons, Dr. Gajendragadkar's March 2012 opinion does not constitute substantial evidence supporting the ALJ's RFC finding.

case should be remanded so that the ALJ may reconsider all of the record evidence concerning Claimant's upper extremity impairments.[4] On remand, the ALJ must either more fully explain why Claimant is not functionally limited in this area, or include limitations related to Claimant's upper extremity impairments consistent with the record evidence. Because the undersigned recommends remand on this basis, Claimant's third challenge need not be addressed in further detail.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF & R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

---

[4] On this record, the undersigned cannot determine that the ALJ's error was harmless. The jobs identified by the ALJ at step five require handling (gross manipulation) and fingering (fine manipulation). (Tr. at 41-42). According to the Dictionary of Occupational Titles ("DOT"), the garment bagger and document preparer jobs both require the ability to frequently handle and finger. DOT 920.687-018, 1991 WL 687965 (garment bagger); DOT 249.587-018, 1991 WL 672349 (document preparer). The sorter job requires frequent handling and occasional fingering. DOT 222.687-014, 1991 WL 672131.

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 28, 2016

Cheryl A. Eifert
United States Magistrate Judge